2016-1106

# United States Court of Appeals
# for the Federal Circuit

DUKE UNIVERSITY,

*Appellant,*

*v.*

BIOMARIN PHARMACEUTICAL INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board, IPR No. 2013-00535*

## BRIEF OF APPELLEE, BIOMARIN PHARMACEUTICAL INC.

GERALD M. MURPHY, JR.
MARYANNE ARMSTRONG, PH.D.
EUGENE T. PEREZ
LYNDE F. HERZBACH
BIRCH, STEWART, KOLASCH & BIRCH, LLP
8110 Gatehouse Road
Suite 100 East
Falls Church, VA 22042
Telephone: (703) 205-8000

*Counsel for Appellee*
*BioMarin Pharmaceutical Inc.*

MAY 27, 2016

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 26.1 and 47.4, counsel for appellee certifies the following:

1. The full name of every party or amicus represented by us is:

BioMarin Pharmaceutical Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented:

BioMarin Pharmaceutical Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:

Capital Research Global Investors
333 South Hope Street
Los Angeles, CA 90071

4. The names of all law firms and the attorneys that appeared for the party now represented in the trial court or are expected to appear in this Court are:

BIRCH, STEWART, KOLASCH, & BIRCH, LLP: Gerald M. Murphy, Jr., MaryAnne Armstrong, Ph.D., Eugene T. Perez, Lynde F. Herzbach.

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ............................................................. vi

TABLE OF ABBREVIATIONS ............................................................x

STATEMENT OF RELATED CASES ................................................. xi

STATEMENT OF JURISDICTION......................................................1

COUNTERSTATEMENT OF THE CASE AND FACTS .......................................1

I.     History of Enzyme Replacement Therapy and Milestones of Development for Treatment of Pompe Disease Describe the Roadmap for Successful Treatment ..................................................2

     A. The Active 110 kD Precursor Form of hGAA was Well-Documented Over Ten Years Before the Critical Date.............................2

     B. During the Mid- to Late-1990s, Two Methods for Producing hGAA for Treating Pompe Disease by Enzyme Replacement Therapy Were Developed.........................................................3

          1. CHO Cells were the Preferred System for Manufacturing Various Therapeutic Proteins Including hGAA...................................5

          2. The Prior Art Taught that CHO Cell Produced hGAA Would be the Same as or Nearly Similar to hGAA Produced Using Transgenic Animals...............................................................6

     C. By 2000, Researchers and Doctors in the Field were Optimistic that ERT for Pompe Disease Would be Successful ...................................6

     D. Van Bree '410 Discloses a Method of Treating Pompe Disease Using hGAA From Multiple Sources.........................................................9

     E. The '712 Patent Filed by Duke Did Not Claim a Novel Invention Regarding ERT for Pompe Disease.........................................................10

F. The Commercial Success of Genzyme's Myozyme and Lumizyme is Due to Multiple Patents Preceding the '712 Patent and Licensing of Additional Technology and Know-How ..............................................11

II. The IPR Resulted in a Well-Supported Final Decision that Relied on Evidence in the Record and Addressed the Parties' Arguments ..................13

A. The Final Written Decision was Supported by Substantial Evidence and Relied on Correct Claim Constructions ...........................13

1. The Board's Claim Constructions .....................................................13

2. The Board's Findings Regarding Anticipation ...................................14

3. The Board's Obviousness Conclusions ..............................................15

B. The Decision on Request for Rehearing Provided Additional Analysis and Support for Concluding Claim 19 was Obvious ...............16

C. BioMarin-Petitioner's Arguments and Experts ........................................17

1. State of the Art Prior to July 18, 2000 ...............................................18

2. Grounds for Unpatentability ..............................................................18

a. Obviousness Grounds ....................................................................19

b. Anticipation by van Bree '410 .....................................................19

3. Matthew Croughan, Ph.D. - Production Expert ................................19

4. Gregory Pastores, M.D. - Medical Doctor with Experience Treating LSD ......................................................................................21

D. Duke/Synpac-Patent Owner's Arguments and Experts ..........................22

1. Patent Owner's Experts .....................................................................23

2. Reliance on Canfield ........................................................................24

SUMMARY OF ARGUMENT ............................................................................25

STANDARD OF REVIEW ..................................................................................28

ARGUMENT ......................................................................................................30

I.    The Board's Conclusions That Claims 1–9, 11, 12, 15, and 18–21 are
      Obvious are Supported by the Record and Duke/Synpac Have Failed
      to Show Any Error in the Board's Conclusions ............................................30

      A. Treating a Pompe Patient with CHO GAA Was Obvious Because
         Production of hGAA in CHO Cells Was a Known and Predictable
         Solution to the Manufacturing Need ........................................................32

      B. Dr. Chen and Others Touted the Virtues of Using hGAA Produced
         in CHO Cells in ERT for Pompe Patients .................................................33

      C. There Was Overwhelming Acceptance of the High Expectation
         that Administering hGAA Produced in CHO Cells Would
         Successfully Treat Pompe Disease ...........................................................35

      D. Claim 9 Is Obvious Under the Board's Claim Construction of
         "Precursor" and Under Duke/Synpac's Improper Construction ..............39

      E. Prophylactic Administration of Immunosuppressants was a
         Common Sense Solution to Expected Immune Responses Informed
         by the Experience with Other Therapeutic Proteins.................................40

      F. The Board Properly Weighed Secondary Considerations and
         Correctly Found Duke/Synpac Failed to Prove Nexus ...........................44

      G. Claims 1–9, 11, 12, 15, and 18–21 of the '712 Patent are Obvious.........47

II.   Van Bree '410 Anticipates Claims 1-9, 12, 15, 20-21 of the '712
      Patent Based on its Disclosure of a Method of Treating Pompe
      Patients Using hGAA from Multiple Sources Including CHO Cells............48

      A. The Board's Final Written Decision on Anticipation is Supported
         by Not Only Substantial But Overwhelming Evidence ...........................49

      B. The Board Correctly Found That van Bree '410 Anticipates Claims
         1-9, 12, 15, and 20-21..............................................................................52

      C. There Was No Ultra Vires Conduct by the Board Because the
         Petition Specifically Included an Anticipation Ground for Claims
         1-9, 11-12, 15, and 20-21 Based on van Bree '410.................................55

iv

D. The Board's Claim Construction Regarding Claim 9 is Proper and there are No Internal Inconsistencies in the FWD when the Board's Actual Construction of Precursor is Applied ...........................................56

CONCLUSION ......................................................................................60

CERTIFICATE OF SERVICE ..............................................................61

CERTIFICATE OF COMPLIANCE.......................................................63

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,*
   853 F.2d 1557 (Fed. Cir. 1988)..........................................................................54

*Belden Inc. v. Berk-Tek LLC,*
   805 F.3d 1064 (Fed. Cir. 2015)..........................................................................54

*Dippin' Dots, Inc. v. Mosey,*
   476 F.3d 1337 (Fed. Cir. 2007)..........................................................................58

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.,*
   471 F.3d 1369 (Fed. Cir. 2006)..........................................................................48

*Graham v. John Deere Co. of Kansas City,*
   383 U.S. 1 (U.S. 1966)......................................................................................30

*Hoffman-La Roche Inc. v. Apotex Inc.,*
   748 F.3d 1326 (Fed. Cir. 2014).................................................................. 37, 43

*HP Inc. v. MPHJ Tech. Invs., LLC,*
   2016 U.S. App. LEXIS 6172 (Fed. Cir. Apr. 5, 2016) .......................................30

*Impax Labs., Inc. v. Aventis Pharms. Inc.,*
   545 F.3d 1312 (Fed. Cir. 2008)..........................................................................48

*In re Bond,*
   910 F.2d 831 (Fed. Cir. 1990)............................................................................48

*In re Cuozzo Speed Techs., LLC,*
   793 F.3d 1268 (Fed. Cir. 2015).................................................................. 28, 55

*In re Donohue,*
   766 F.2d 531 (Fed. Cir. 1985)............................................................................49

*In re Gartside,*
   203 F.3d 1305 (Fed. Cir. 2000)...........................................................29

*In re Gleave,*
   560 F.3d 1331 (Fed. Cir. 2009)............................................ 29, 48, 54

*In re Mettke,*
   570 F.3d 1356 (Fed. Cir. 2009).................................................. 29, 45

*In re Montgomery,*
   677 F.3d 1375 (Fed. Cir. 2012)...........................................................52

*In re Petering,*
   301 F.2d 676 (C.C.P.A. 1962) ............................................................29

*In re Seaborg,*
   51 C.C.P.A. 1109, 328 F.2d 996 (CCPA 1964)...................................52

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.,*
   780 F.3d 1376 (Fed. Cir. 2015)...........................................................29

*KSR Int'l. Co. v. Teleflex Inc.,*
   550 US 389 (2007)........................................................... 33, 38, 42, 43

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
   485 F.3d 1157 (Fed. Cir. 2007)...........................................................42

*MEHL/Biophile Intern. Corp. v. Milgraum,*
   192 F. 3d 1362 (Fed. Cir. 1999).........................................................52

*Moleculon Research Corp. v. CBS, Inc.,*
   793 F.2d 1261 (Fed. Cir. 1986)...........................................................55

*Ormco Corp. v. Align Tech., Inc.,*
   463 F.3d 1299 (Fed. Cir. 2006)...........................................................46

*Par Pharm., Inc. v. TWi Pharms., Inc.,*
   773 F.3d 1186 (Fed. Cir. 2014)...........................................................30

*Petersen Mfg. Co. v. Central Purchasing, Inc.,*
740 F.2d 1541 (Fed. Cir. 1984)............................................................54

*Pfizer, Inc. v. Apotex, Inc.,*
480 F.3d 1348 (Fed. Cir. 2007)............................................................38

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,*
491 F.3d 1342 (Fed. Cir. 2007)............................................................38

*Schering Corp. v. Geneva Pharms., Inc.,*
339 F.3d 1373 (Fed. Cir. 2003)............................................................49

*SightSound Techs., LLC v. Apple, Inc.,*
809 F.3d 1307 (Fed. Cir. 2015)............................................................45

*SmithKline Beecham Corp. v. Apotex Corp.,*
403 F. 3d 1331 (Fed. Cir. 2005)............................................................52

*Spectrum Pharm. Inc. v. Sandoz Inc.,*
802 F.3d 1326 (Fed. Cir. 2015)............................................................35

*Therasense, Inc. v. Becton, Dickinson and Co.,*
593 F.3d 1289 (Fed. Cir. 2010)............................................................46

*Wyers v. Master Lock Co.,*
616 F.3d 1231 (Fed. Cir. 2010)............................................................38

**Statutes, Rules and Regulations**

28 U.S.C. § 1295(a)(4)(A) .......................................................................1

35 U.S.C. § 6(a) .....................................................................................38

35 U.S.C. § 102(b) .................................................................................29

35 U.S.C. § 141(c) ...................................................................................1

21 C.F.R. 316.20 ....................................................................................36

21 C.F.R. 316.25(a)(2) ............................................................................36

37 C.F.R. § 90.3 .......................................................................................1

**Other Authorities**

The Bluebook, A Uniform System of Citation, §5.3 (Eighteenth Edition 2005) ....57

The Chicago Manual of Style, § 13.48 (16th ed. 2010) .........................................57

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **BioMarin** | Appellee BioMarin Pharmaceutical Inc. |
| **Duke/Synpac** | Appellant and Real Parties in Interest, Duke University and Synpac Venture Capital, L.P. |
| **Board** | Patent Trial and Appeal Board |
| **CHO GAA** | Human acid α-Glucosidase produced by CHO cells |
| **D.I. 22** | Brief for Appellant |
| **ERT** | Enzyme Replacement Therapy |
| **GAA** | Acid α-Glucosidase |
| **GSD-II** | Glycogen Storage Disease Type II |
| **LSD** | Lysosomal Storage Disease |
| **M6P** | Mannose-6-phosphate |
| **Pompe Disease** | Glycogen storage disease type II; GSD-II |
| **Reuser '771** | PCT Publication WO 97/05771 to Reuser et al. (Feb. 20, 1997) |
| **tgGAA** | GAA expressed in the milk of transgenic mammals |
| **van Bree '410** | van Bree, U. S. Patent 7,351,410 |
| **Van Hove 1997** | Van Hove *et al.*, *Purification of recombinant human precursor acid α-glucosidase*, 43(3) BIOCHEMISTRY AND MOLECULAR BIOLOGICAL INT'L 613 (1997). |
| **Van Hove 1996** | Van Hove *et al.*, *High-level production of recombinant human lysosomal acid alpha – glucosidase in Chinese hamster ovary cells which targets to heart muscle and corrects glycogen accumulation in fibroblasts from patients with Pompe disease*, 93 Proceedings of the National Academy of Sciences of the United States of America 65 (1996). |

## STATEMENT OF RELATED CASES

No appeal in this matter was previously before this or any other appellate court. Counsel for Appellee are not aware of any other case that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

This appeal arises from a final written decision ("FWD"), which was confirmed in a decision on request for rehearing, of the Patent Trial and Appeal Board (the "Board") in *inter partes* review ("IPR") of U.S. Patent No. 7,056,712 (the "'712 patent"). The Board entered the FWD on February 23, 2015 and entered a decision on request for rehearing relating to only claim 9 on July 14, 2015. Appellant Duke University/Synpac Venture Capital, L.P. ("Duke/Synpac") timely filed a notice of appeal. *See* 37 C.F.R. § 90.3. This Court has jurisdiction over Duke/Synpac's appeal of the Board's FWD and decision on request for rehearing under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## COUNTERSTATEMENT OF THE CASE AND FACTS

The Board instituted an IPR in response to a Petition filed by BioMarin. The Petition was supported by two expert declarations, prior art that provided the state of the art as of July 18, 2000 and specific grounds under which the challenged claims were invalid. A116-18; *see also* A22-23. The Board evaluated the record and held that van Bree '410 anticipates claims 1–9, 12, 15, and 18–21 of the '712 patent and that claims 1–9, 11, 12, 15, and 18–21 would have been obvious over Reuser '771 in view of Van Hove 1997, and van der Ploeg, Bembi, and/or Brady. A61; A22-23; A13-14. The Board's findings were the only reasonable conclusions based on the asserted grounds, state of the art, and record evidence.

1

I.     **History of Enzyme Replacement Therapy and Milestones of Development for Treatment of Pompe Disease Describe the Roadmap for Successful Treatment**

The '712 patent relates to the treatment of a human patient with a lysosomal storage disease ("LSD") known as Pompe disease, also known as glycogen storage disease type II ("GSD-II"). A101. Individuals with Pompe disease lack sufficient quantities of the glycogen degrading lysosomal enzyme acid α-glucosidase ("GAA"), which breaks down glycogen into glucose. *Id.* The deficiency results in build-up of lysosomal glycogen in almost all tissues of the body. *Id.* Pompe disease encompasses a range of effects in patients that have different ages of onset, organs involved, and clinical severity that generally correlates with the residual amount of GAA activity. *Id.* By the 1990s, three distinct subtypes of Pompe disease had been characterized: infantile, juvenile, and adult. A3698; A3758. While there were some disappointments in early attempts to treat Pompe disease, the reason for the early failures (use of inactive forms of GAA) was understood more than a decade prior to the critical date. A531, 534.

A.     **The Active 110 kD Precursor Form of hGAA was Well-Documented Over Ten Years Before the Critical Date**

In 1988, van der Ploeg described cellular uptake of different forms of hGAA by muscle cells, including an active "high-uptake in the 110 kD precursor." A532. Van der Ploeg also explained the importance of the mannose-6-phosphate (M6P) receptor on the cell surface as a target for an enzyme precursor with

2

phosphorylated high-mannose types carbohydrate chains. A531-33. Van der Ploeg

discovered that attempts to treat Pompe disease failed in the past due to a lack of

optimal conditions and lack of knowledge regarding various forms of GAA and the

importance of M6P. A534.

During the 1990s, multiple references described the properties and

suitability of the GAA precursor form for treating Pompe disease. *See* A453:20-25;

A491-92; A475 at 2:43-45; A484 at 20:41-48; A3758 at Abstract. The research in

the mid- to late-1990s focused on the active precursor form. *See id.*; *see also* A561

at ¶ 57, A634-637 at ¶¶ 77-83, A639-642 at ¶¶ 87-94. Thus, prior to July 17, 1999

(one year before Duke's earliest filing date) and continuing through July 2000, it

was well known that the precursor form of hGAA should be used for ERT in

humans.

**B.    During the Mid- to Late-1990s, Two Methods for Producing hGAA for Treating Pompe Disease by Enzyme Replacement Therapy Were Developed**

Once the precursor form of hGAA was identified as the active form of the

enzyme, the last practical drawback to ERT for Pompe disease was production of

large quantities of hGAA for clinical trials. A3758; A540; A492; A562 at ¶ 61;

A568 at ¶ 78. The two most promising production techniques were (1) production

in CHO cells and (2) production in the milk of transgenic mammals. A430 at lines

13-18; A625-28 at ¶¶ 59, 60, 62; A638-54 at ¶¶ 86-94, 111-113. A person of

3

ordinary skill in the art ("POSA") would have identified production in CHO cells as the clear first choice. A653-54 at ¶ 112.

Dr. Reuser, Dr. Van der Ploeg, and others collaborated on producing hGAA in transgenic mammals by creating transgenic mice that could express GAA in milk. A3854-56; A431-32. These researchers filed a patent application that published in 1997 as WO 97/05771 ("Reuser '771"); it was assigned to Pharming B.V. A426. In 1998, researchers from Pharming joined with researchers from Genzyme to file another patent application with Dr. van Bree as the first named inventor; this application resulted in, *inter alia*, U.S. Patent 7,351,410 ("van Bree '410"). A466. Reuser '771 and van Bree '410 described the actual production of hGAA in transgenic mice and suggested that CHO cells could also be used to produce hGAA. A430 at lines 15-17; A481 at 13:58-60.

At about the same time, Dr. Yuan-Tsong Chen and others at Duke University were preparing GAA in CHO cells with the goal of using the CHO produced hGAA to treat Pompe patients. A3777-8. Synpac, one of the real parties of interest in this proceeding, entered into separate agreements with Duke and Genzyme regarding this technology. A3778; A302. Duke, Dr. Chen, and Synpac all expressed optimism prior to 2000 that CHO GAA could be used in ERT to effectively treat Pompe patients. A3776-77; A3765 at ¶ 2; A3767.

### 1.    *CHO Cells were the Preferred System for Manufacturing Various Therapeutic Proteins Including hGAA*

CHO cells would have been the preferred choice for production for hGAA in the late 1990s for many reasons, including the fact that the FDA had already approved various CHO-derived glycosylated therapeutic proteins. A621, A623-26. By the year 2000, over 80% of therapeutic proteins produced in mammalian cells and approved for use in humans were produced in CHO cells. A625-26.

Van Hove 1996 (co-author Dr. Chen) demonstrated that M6P-modified, precursor form of GAA produced in CHO cells was capable of *in vivo* uptake in heart and liver tissues in guinea pigs. A540-541, A564-65, A568-70; *see also* A35-36. Van Hove concluded:

> Recombinant acid α-glucosidase joins a growing list of recombinant lysosomal enzymes produced in CHO cells that exhibit <u>high uptake mediated by the mannose-6-phosphate receptor</u>. The decrease of both lysosomal and cytoplasmic glycogen with enzyme treatment and the <u>strikingly increased enzyme levels in the heart</u> following intravenous injection illustrate the potential of this recombinant enzyme for *in vivo* targeting and correction of affected tissues in Pompe disease.

A541 (emphasis added).

Interestingly, the '712 patent reported that the same GAA disclosed by Van Hove 1996 was used in the clinical trials discussed in the patent. A104 at 8:48-55. This is not surprising given Dr. Chen's statement in 1997 that he anticipated that CHO cell produced rhGAA would be taken up by muscle cells and restore normal glycogen levels. A3778.

5

## 2. The Prior Art Taught that CHO Cell Produced hGAA Would be the Same as or Nearly Similar to hGAA Produced Using Transgenic Animals

The prior art disclosed that hGAA produced in CHO cells had the same ability to restore endogenous GAA activity as hGAA produced using transgenic mammals. More specifically, van Bree '410's Example 3 described analyzing acid α-glucosidase produced in the milk of transgenic mice and concluded "restoration of the endogenous acid α-glucosidase activity by acid α-glucosidase isolated from mouse milk was as efficient as restoration by acid α-glucosidase purified from bovine testis, human urine and medium of transfected CHO cells." *Id*. at 20:32–37; see also A32. Van Bree '410 also described, "the N-terminal amino acid sequence of the recombinant α-glucosidase produced in the milk of mice was shown to be the same as that of α-glucosidase precursor from human urine." *Id*. at 20:41–48.

Reuser '771 also disclosed that post-translational processing of natural GAA and recombinant hGAA produced in CHO cells is similar. A436 at 9:29-34; *see also* A43. Based on the prior art, BioMarin's witnesses both testified that CHO GAA and tgGAA had similar properties. A640-42; A560-2. A POSA in 2000 would not have expected differences in CHO GAA versus tgGAA.

## C. By 2000, Researchers and Doctors in the Field were Optimistic that ERT for Pompe Disease Would be Successful

In September 1995, Reuser published a "minireview" that summarized developments relating to treatment of Pompe disease and indicated that ERT was

under development. A3697-705. At that time, major strides towards ERT for Pompe disease had already been accomplished and the field was optimistic. *Id*. Reuser discussed reasons for prior problems in treating Pompe disease, such as insufficient quality and quantity of enzyme, and cited five prior art references discussing the solutions, i.e. active precursor form of GAA. A3703.

Researchers working on possible treatments for Pompe disease were excited by the development of ERT for type I Gaucher's disease, which is also an LSD. A3703. Many of the same basic principles learned from ERT for Gaucher's disease were used to develop models for Pompe disease. *Id.*; *see also* A502-05; A55, A57.

In March 1997, Drs. Reuser and van der Ploeg published an article that concluded "…we should feel encouraged that after so many years of waiting a realistic and promising attempt at enzyme replacement therapy for GSDII will be taken." A3726-27. In September 1997, Duke announced that the FDA granted Orphan Drug Designation ("ODD") for its GAA for treating Pompe disease. A3777. Dr. Chen "anticipated that recombinant enzyme will … restore normal glycogen levels." A3778.

Less than six months later, in February 1998, Duke announced that "Duke Researchers Develop First Treatment for Rare Muscle Disease" and Dr. Chen indicated, "ERT was a promising therapy." A3775-6. A 1998 reference by Dr. Kikuchi (co-author Dr. Chen), demonstrated that hGAA produced in CHO cells

7

was able to target skeletal and heart muscle, reduce glycogen stores, and cause biochemical and functional improvement in a quail model of Pompe disease, leading to the conclusion that ERT using rhGAA is "a promising therapy for human Pompe disease." A3767.

Also in 1998, Yang demonstrated that the recombinant hGAA produced in CHO cells had similar *in vitro* capabilities in acid maltase deficiency (AMD) quail fibroblasts and myoblasts as in human Pompe fibroblasts. A3858. In October 1998, Bijvoet compared various types of GAA, including GAA produced in CHO cells, and demonstrated that an M6P-modified, precursor form of GAA produced in transgenic mice will target skeletal muscle and heart tissue and correct the storage phenotype in a GAA knockout mouse model of Pompe disease. A3779. In June 1999, Synpac reported that Dr. Chen and Duke had begun ERT trials in Pompe patients using GAA produced in CHO cells.[1] A3765.

Based in part on the above publications, a POSA would conclude that before the critical date of July 2000 there was a high likelihood that treatment of Pompe patients with CHO GAA would be successful. *See*, *e.g.*, A553-56, A576-78 at ¶¶ 35, 44, 96-99.

---

[1] In August 1998, Pharming also announced that Phase I clinical trials had been successfully completed using hGAA from the milk of transgenic animals. A3871. Later that year in October, Pharming announced that Phase II clinical trials were planned. A3869-70.

### D.    Van Bree '410 Discloses a Method of Treating Pompe Disease Using hGAA From Multiple Sources

Van Bree '410 teaches "methods of treating Pompe disease using human acid alpha glucosidase" and claims priority to an application filed in December 1999 and a provisional application filed in December 1998. A466; *see* A3806-07 (provisional). The preferred treatment regime comprises "administering greater than 10 mg/kg body weight per week to a patient." A466. Claim 1 recites a "method of treating a human patient with Pompe disease, comprising intravenously administering biweekly to the patient a therapeutically effective amount of human acid alpha glucosidase, whereby the concentration of accumulated glycogen in the patient is reduced and/or further accumulation of glycogen is arrested." A489.

Van Bree '410 notes that rhGAA produced in CHO cells is as efficient as rhGAA isolated from the milk of transgenic animals in restoring endogenous GAA activity. A484 at 20:32-36; *see also* A477 at 6:11-16, 20:41-48. Van Bree '410 also describes the active precursor form of rhGAA and notes that the "main species recognized" of post translational hGAA "are a 110/100 kD precursor, a 95 kD intermediate and 76 kD and 70 kD mature forms." A477 at 6:6-11.

There are seven examples in van Bree '410 that describe rhGAA, including its use in an animal trial and human clinical trials. A482-88. Example 5 discloses a "Human Clinical Trial" that was conducted by administering rhGAA intravenously to healthy volunteers. A486. The volunteers received two doses administered two

9

weeks apart, where each dose ranged from 25 to 800 mg. *Id*. Example 5 also

included a prophetic clinical trial with infantile and juvenile Pompe patients. A487.

After a review of the data, it was clear that levels of residual lysosomal GAA

activity that were high enough to be in a range where Pompe disease does not

occur are "very well achievable using recombinant precursor enzyme." A486.

### E. The '712 Patent Filed by Duke Did Not Claim a Novel Invention Regarding ERT for Pompe Disease

The '712 patent was filed on July 10, 2001 and claims priority to a

provisional application filed on July 18, 2000. A94. The method of treatment

disclosed and claimed is ERT for Pompe disease. A94, A101-107. Claim 1 recites

a method of treating Pompe disease in humans by administering a therapeutically

effective amount of hGAA at an administration interval, where the hGAA was

produced in CHO cells. A106. In one embodiment disclosed in the '712 patent, the

method of treating uses rhGAA, such as rhGAA in precursor form, that was

produced in CHO cells. A102 at 5:3:57-4:4. The '712 patent further discloses an

example detailing a Phase I/II Trial using rhGAA produced in CHO cells

administered to three infants with Pompe disease. A103-06. As detailed above, by

July 18, 2000, it was expected that Pompe disease could be treated using ERT with

the active 110 kD precursor form of rhGAA produced in CHO cells.

The '712 patent indicates that other "agents," such as antihistamines or

immunosuppressants, can be given in conjunction with the GAA. A103 at 5:29-33.

10

In the reported clinical trials, two of the patients were given diphenhydramine, an antihistamine, but only after a skin rash was observed. A105 at 9:37-53. It was noted, "[n]o serious allergic reactions occurred during enzyme therapy." *Id*. None of the three infants was given an immunosuppressant at any time during their reported treatment.

> **F.    The Commercial Success of Genzyme's Myozyme and Lumizyme is Due to Multiple Patents Preceding the '712 Patent and Licensing of Additional Technology and Know-How**

Genzyme Corporation markets and sells Myozyme and Lumizyme, which are two FDA approved treatments for Pompe disease. According to Genzyme's 10-k disclosures, Myozyme and Lumizyme are "protected by U.S. Patent Nos. 6,118,045 [Reuser], which expires on August 18, 2018; 7,351,410 [van Bree], which expires on October 29, 2020 and 7,655,226 [van Bree], which expires on December 16, 2019; and corresponding international counterparts." A3876-77. In a section entitled "Licensed Patents," Genzyme's 10-k states, *inter alia*, "Myozyme/Lumizyme is protected by U.S. Patent No. 7,056,712, which we license from Synpac Pharmaceuticals (U.K.) Limited, or Synpac, and which expires on February 26, 2023, and international counterparts." A2339-40. Therefore, Myozyme and Lumizyme are protected by at least four different patents, the '712 patent at issue being the last to expire.

The license to Genzyme covers additional intellectual property or technology, such as cell lines, besides patent rights. A2147; A3097 (Synpac and Genzyme agreement "related to the '712 patent, among other things"). Synpac licensed "intellectual properties," and not just the '712 patent, to Genzyme in 2000 and amended the agreement in 2006. A2147. Some of the intellectual properties licensed by Synpac to Genzyme were via Duke. *Id.*

Under the terms of a 1996 agreement, Duke granted rights to the '712 patent to Synpac and Duke assigned "TECHNOLOGY" and "TECHNICAL INFORMATION" to Synpac. A2314. The TECHNOLOGY was defined as "the cell line set forth in Exhibit A, attached hereto and incorporated herein by reference, all progeny and derivatives of said cell line, and PATENTS." A2316. The TECHNICAL INFORMATION was defined as "all scientific or technical information, know-how, show-how, data, and test results, regardless of form or characteristics relating to the SUBJECT AREA developed, produced or generated by DUKE PERSONNEL." *Id*. The agreement transferred much more than rights under the '712 patent.

12

## II. The IPR Resulted in a Well-Supported Final Decision that Relied on Evidence in the Record and Addressed the Parties' Arguments

### A. The Final Written Decision was Supported by Substantial Evidence and Relied on Correct Claim Constructions

In its FWD, the Board found that van Bree '410 anticipates claims 1-9, 12, 15, and 20-21 of the '712 patent and that claims 1-9, 11, 12, 15, and 18-21 would have been obvious over Reuser '771 in view of Van Hove 1997, and van der Ploeg, Bembi, and/or Brady. A61. The Board's decision included several important factual determinations, including a determination that the precursor form of hGAA was a main species (A32), hGAA produced in CHO cells was similar to and produced a similar effect as hGAA from transgenic animals (A32, A36), hGAA produced in CHO cells was taken up by heart cells in *in vivo* animal studies and was phosphorylated at a high level (A36), no evidence shows what exact "preparation was obtained" by Dr. Canfied (A36), the Canfield patent and others discussed in the FWD would have had provided a POSA with a reason to use rhGAA produced in CHO cells in ERT (A36, A38, A50), and the McVie-Wylie Poster disclosed that hGAA produced by either method cleared glycogen (A38).

#### 1. The Board's Claim Constructions

In its FWD, the Board construed various terms. A26-29. With respect to the only term at issue in this appeal, the Board construed 'precursor' in claim 9 to mean 'any precursor of recombinant hGAA (e.g. a 110-kD form) that is exclusively produced in CHO cell cultures.' *See* A29. The Board went on to

13

explain that claim 9 does not preclude also administering a non-precursor form of hGAA or rhGAA, even if it requires some precursor CHO GAA. *Id.* This construction is mentioned during the Board's patentability analysis of claim 9 when it noted "precursor" was construed "as encompassing both precursor and non-precursor forms of rhGAA at the same time, and not limited to administering exclusively a precursor form and no other form." A39-40.

## 2. *The Board's Findings Regarding Anticipation*

In its FWD, the Board held that van Bree '410 anticipated claims 1-9, 12, 15, and 20-21 of the '712 patent. A39-40, A42. The Board concluded that van Bree '410 described administering hGAA produced in CHO cell cultures to Pompe patients in the same manner, i.e., using the same amounts and dosage intervals, as described for hGAA produced in transgenic animals. A37. The Board was not persuaded by Duke/Synpac's expert witnesses on this point. A37-38.

The Board acknowledged multiple passages in van Bree '410 that discussed the suitability of CHO cells to produce GAA. A33. The Board rejected Duke/Synpac's argument that "van Bree does not disclose the combination of features: (i) administering a therapeutically effective amount of hGAA; (ii) produced in CHO cell cultures; and (iii) periodically at an administration interval arranged as recited in claims 1 and 20." A32-39; *see also* A264-66.

14

Regarding claim 9, the Board stated, "we construe 'precursor' in claim 9, and the rest of claims 1 and 9, as encompassing administering both precursor and non-precursor forms of rhGAA at the same time, and not limited to administering exclusively a precursor form and no other form." A39-40. The Board went on to find that van Bree '410 disclosed administering a precursor of recombinant hGAA produced in CHO cell cultures, "even assuming the reference teaches administering a 'mixture which 'is preferably predominantly (i.e., >50%) in the precursor form of about 100-110 kD.''" A40. The Board also found that van Bree '410 disclosed the limitations of claim 21 based on descriptions of varying the administration interval over time. A41-42.

### 3.    *The Board's Obviousness Conclusions*

The Board's FWD concluded that claims 1–9, 11, 12, 15, and 18–21 would have been obvious, specifically (i) claims 1-9, 15, and 20 would have been obvious over Reuser '771 in view of Van Hove 1997 (A42-50); (ii) claims 11, 12, and 21 would have been obvious over Reuser '771 in view of Van Hove 1997, van der Ploeg, and Bembi (A50-55), and (iii) claims 18 and 19 would have been obvious over Reuser '771 in view of Van Hove 1997 and Brady. A55-59.

In response to the Duke/Synpac argument that objective evidence of secondary considerations demonstrated non-obviousness, the Board found that

15

Duke/Synpac failed to establish a nexus between the claimed methods and any of the asserted secondary considerations. A59-61.

## B.    The Decision on Request for Rehearing Provided Additional Analysis and Support for Concluding Claim 19 was Obvious

After the FWD, Duke/Synpac filed a Request for Rehearing regarding the finding of obviousness of claim 19 (A388-99), BioMarin filed an opposition (A400-06), and Duke/Synpac filed a Reply (A407-14). In its request, Duke/Synpac argued that "none of the prior art references recognized the problem addressed by claim 19, much less suggested the claimed solution of administering an immunosuppressant prior to the first administration of hGAA to the individual." A393. Duke/Synpac argued that Brady did not disclose administration of an enzyme prior to the very first administration of the enzyme, but admitted "Brady discusses administration of an immunosuppressant in some instances prior to a subsequent administration of the enzyme." A395. The Board granted Duke/Synpac's Request for Rehearing and expanded the analysis, with a majority of the panel holding that claim 19 would have been obvious. A2, A6-13.

The Board's additional analysis explained that the use of immunosuppressants in ERT for individuals with a lysosomal protein deficiency was known prior to the '712 patent and the choices of administering an immunosuppressant before an adverse immune response develops in a patient or after a patient has experienced an adverse immune response are predictable

16

variations producing the same result - prevention of an adverse immune response to a foreign protein. A3-4, A13; *see also* A7-9 ("the preponderance of evidence on record shows that it was known to use an immunosuppressant in conjunction with Gaucher disease, when treating with an enzyme replacement therapy"). The Board relied on the Petition, the Brady reference, Dr. Pastores' declaration, and Dr. Wasserstein's testimony in reaching its conclusion. *Id.*

The Board found that Brady described, "an unwanted immune response when administering an exogenous enzyme, a method for reducing that immune response by administering an immunosuppressant, and suggests that its method would be helpful in reducing a similar reaction when administering enzyme replacement therapy in patients having other enzyme-deficiency disorders." A4. Brady also disclosed that the use of an immunosuppressant in conjunction with ERT is likely to be helpful in ERT in other disorders where a genetic mutation abrogates the production of the protein. A526; *see also* A3-4. The Board held that, contrary to Duke/Synpac's argument, the "problem" of a potential unwanted immune response when administering an exogenous enzyme was known as was the administration of an immunosuppressant to help reduce the unwanted response. *Id.*

## C.    BioMarin-Petitioner's Arguments and Experts

BioMarin's Petition and supporting exhibits detailed the state of the art during the relevant time period, the person of ordinary skill in the art, and the

grounds for unpatentability. The Petition was supported by two expert declarations:

1) Mathew Croughan, Ph.D. testified regarding the state of knowledge relating to

the production of recombinant proteins during the late 1990s, specifically the

production of enzymes for LSDs such as Pompe disease; and 2) Gregory Pastores,

M.D., a POSA, testified regarding the state of the art and specific prior art

references at issue. A120; A608-09; A544-46.

### 1.    *State of the Art Prior to July 18, 2000*

BioMarin's Petition included a section entitled, "Determining the Scope and

Content of the Prior Art," which included two subsections, "Early Development of

ERT to Treat Pompe Disease" and "State of the Art: Pre-July 1999 (A Road Map

for Drug Development)." A108-9; A122-25. The state of the art was provided as of

July 17, 1999 in order to provide references that dated more than one year before

the '712 patent's earliest priority date of July 18, 2000. The state of the art

included important references, including van Bree '410, Reuser mini-review,

Reuser '771, Van Hove 1996, Van Hove 1997, Kikuchi, and press releases from

Duke and Synpac. *See* A123-25.

### 2.    *Grounds for Unpatentability*

The Petition alleged twelve distinct grounds for unpatentability for various

subsets of the claims. A110-11; A132-66. Each ground specified which claims

were challenged and provided evidence and citations to the record to support the allegation. *Id.*

### a.    *Obviousness Grounds*

The Petition included various grounds alleging that claims 1-9, 11, 12, 15, and 18-21 were invalid for obviousness. A110-11, A139-66. Grounds 2, 4, and 9-12 all involved Reuser '771. A110-11, A139-46, A161-66. Grounds 9-12 were based on a combination of, *inter alia*, Reuser '771 and Van Hove 1997. A161-66.

### b.    *Anticipation by van Bree '410*

The Petition also alleged that claims 1-9, 12, 15, and 18-21 of the '712 patent were anticipated by van Bree '410. A110, A146-50. The Petition, claim chart, and expert declarations supported BioMarin's allegation that van Bree'410 anticipated these claims. *See* A146-50, A182-84, A558, A567, A577-78. The Petition included specific citations to van Bree '410 for every claim element. *Id.* The Petition itself provided a detailed discussion of the anticipation argument, while an attached claim chart summarized the argument. A146. A review of the claim chart shows that every element is accounted for, especially when the dependent claims are considered in light of the broader corresponding element in claim 1. A182-84.

### 3.    *Matthew Croughan, Ph.D. - Production Expert*

Dr. Croughan is a scientist with experience in production of recombinant proteins for therapeutic uses. A120; A605-07. His declaration focused on the state

of the art and knowledge of production of recombinant proteins during the late 1990s, specifically the production of enzymes for treating LSDs. A608. Dr. Croughan provided expert opinion regarding the production of therapeutic proteins in mammalian cells, such as CHO cells, and in the milk of transgenic mammals. A608-09. He testified that as of the mid 1990s, "it was clear that CHO cells could readily be used to make many different glycosylated proteins with excellent cellular uptake, bioactivity, and pharmacokinetic properties." A623. He also detailed the advantages of using CHO cells and the number of therapeutic proteins produced in mammalian cells and approved in the U.S. by 2000. A623-26. Dr. Croughan indicated that there is only one approved therapeutic protein made by transgenic animals and explained the reasons why that production method was not widely adopted. A630-32.

Dr. Croughan also testified regarding the best way to produce rhGAA as of July 17, 1999 (more than one year before the '712 patent's earliest priority date). A634-655; A94. Specifically, Dr. Croughan opined, "[a]s of July 17, 1999, it was known that GAA could be recombinantly produced in the milk of transgenic rabbits … and/or in CHO cells…" A652. He noted that, prior to July 17, 1999, the remaining obstacle for successful treatment of human Pompe patients was the ability to produce sufficient quantities. A652. Given the two proposed solutions, transgenic animals or CHO cells, and the known need for appropriate

20

glycosylation, in Dr. Croughan's opinion, the use of a mammalian cell line, like

CHO cells, would have been the first choice for production. A653.

### 4.    Gregory Pastores, M.D. - Medical Doctor with Experience Treating LSD

Dr. Pastores is a medical doctor with experience in the research and

treatment of LSDs and who was a POSA during the relevant time period. A120;

A544-46; A941-42. He provided his opinion regarding "how someone

knowledgeable and skilled in the field of enzyme replacement therapy of

lysosomal storage diseases would approach the task of developing a treatment for

Pompe disease using [ERT], as of July 17, 1999." A556. He used July 17, 1999

because it was more than one year prior to the '712 patent's earliest priority date of

July 18, 2000. A94. Dr. Pastores' declaration provided a summary of the history of

Pompe disease and ERT, as well as an overview of the state of the art. A546-55. In

his opinion, by July 17, 1999, the state of the art "was such that a suitable

recombinant [hGAA] could be produced by following the teachings in the

literature and there was a high likelihood that the [ERT] would be successful" and

"the only outstanding issues at this point were to actually prepare the recombinant

GAA and perform the clinical trials by following what had already been described

in the literature." A556.

Dr. Pastores's declaration included his opinions regarding "[k]nowledge of

the deficient enzyme and its route for intracellular delivery following intravenous

infusion," "[s]ufficient amounts of the enzyme that can be made available for regular infusion," and "[a] demonstration of safety and effectiveness in a pre-clinical trial; i.e. using an animal model of disease if available." A556-65. He also opined regarding the development of ERT for Pompe disease, including preferred intravenous administration, dose and dosing schedules, and possible use of immunosuppressants. A566-76. Lastly, Dr. Pastores concluded that there was a "high expectation" that treating Pompe patients with the rhGAA described in the prior art would be effective and safe and would reduce glycogen stored in the lysosomes. A576-78. This high expectation of a successful ERT for Pompe disease was based on all of the prior art, including the accomplishments in animal models and successful preclinical studies more than one year prior to the '712 patent's earliest priority date. *Id*.

### D. Duke/Synpac-Patent Owner's Arguments and Experts

In its Patent Owner's Response ("POR"), Duke/Synpac argued that the '712 patent was not anticipated or rendered obvious under the instituted grounds. A260-303. Specifically, Duke/Synpac contended that van Bree '410 does not disclose the combination of (i) administering a therapeutically effective amount of hGAA; (ii) produced in CHO cell cultures; <u>and</u> (iii) periodically at an administration interval arranged as recited in claims 1 and 20. A263.

22

Duke/Synpac argued that the instituted claims were not obvious because there was allegedly no reason to combine and allegedly no reasonable expectation of success. A275-76; A281-87; A292-98. Duke/Synpac concluded by also arguing that secondary considerations weighed in favor of not finding the challenged claims obvious, specifically basing their argument on (i) long-felt need and failure by others, (ii) unexpected results, (iii) licensing, (iv) commercial success, and (v) praise and industry acceptance. A300-03.

### 1.    *Patent Owner's Experts*

Duke/Synpac relied on three expert declarations: Melissa Wasserstein, M.D., Richard D. Cummings, Ph.D., and Philip Green.

Dr. Wasserstein provided an opinion regarding the validity of the claims of the '712 patent, in light of the instituted grounds and addressed the declaration and testimony of Dr. Pastores. A1783. Dr. Wasserstein opined that a POSA would not have had a reasonable expectation that Pompe disease could be successfully treated using GAA produced in CHO cells. A1784. She concluded that the '712 patent was not anticipated or rendered obvious under the instituted grounds. Dr. Wasserstein concluded that in her opinion, van Bree '410 did not disclose a "therapeutically effective amount" of CHO-derived GAA. A1810. Dr. Wasserstein's opinions were not always supported by evidence and lacked citations to the record. *See*, *e.g.*, A1816 at ¶80; *see also* A42. During her deposition, Dr. Wasserstein testified that

23

an adverse immunological reaction due to ERT would have been treated similarly to any other adverse immunological reaction. A3591, A3593-94.

Dr. Cummings' was asked to "(1) provide my views as to whether the claims of the '712 Patent are anticipated and/or obvious on the grounds for which the PTAB has instituted trial, and (2) address the comments provided by Drs. Pastores and Croughan in their respective declarations …." A1855. He cited a conference poster indicating what was "later confirmed" in 2003, i.e., after the filing date of '712 patent, to support his opinion regarding the alleged lack of correlation between *in vitro* and *in vivo* GAA uptake. A1901-02 at ¶ 105, A1906-07 at ¶¶ 112, 113 (citing "McVie-Wylie Poster," Ex. 2047).

Mr. Green was retained to provide an opinion regarding secondary considerations. A2009.

## 2.    *Reliance on Canfield*

Duke/Synpac and its experts relied on a patent by Canfield to support its argument that a POSA would have known that the administration amounts and intervals disclosed in van Bree '410 would allegedly be inapplicable to hGAA produced in CHO cell cultures. A265-66, A279-80, A282-83; A1811, A1819.

# SUMMARY OF ARGUMENT

This is not an IPR that went "seriously awry." D.I. 22 (Brief for Appellant) at 1. To the contrary, the Board dutifully and faithfully performed its statutory mandate to consider the parties' arguments and evidence and rule on the grounds on which trial was instituted. Rarely is there a PTAB trial where the evidence of unpatentability is so strong and essentially unrebutted.

The '712 patent is based on the alleged unexpected discovery that GAA produced in CHO cells could be used to successfully treat Pompe Disease. However, in reality, Duke/Synpac simply implemented a drug development plan that had been clearly laid out in the prior art by Dr. Chen, Dr. Reuser, and others. Patents relating to ERT for Pompe disease were filed by (and issued to) Dr. Reuser (A426-65, A3789) and Dr. van Bree (A466-90) long before Dr. Chen filed his patent application.

Although there were some very early failed attempts at ERT using GAA, the reason for the failed attempts was due to inactive GAA, which was explained in the literature more than ten years before the '712 patent's priority date. A531-33. The active form of GAA, a 110 kD precursor form, was identified in 1988. A531. The active form had M6P groups that allowed uptake into cells through the M6P receptor. A531 at Abstract, 534.

In 1995, Reuser published a "mini-review" summarizing the state of the art and laying out a plan for developing an ERT treatment for Pompe disease. A3697.

25

In this article, Reuser (1) noted the excitement at the first successful treatment of a lysosomal storage disease, type 1 Gaucher's disease; (2) indicated that "[f]ollowing these same basic principles we started to develop models for (re)testing the potential effect of $\alpha$-glucosidase administration to patients with GSDII [Pompe];" and (3) indicated that although results to date are promising, "the ultimate effect can only be tested in clinical trials in humans, preferably preceded by tests in animal models." A3703. Reuser also discussed the need for large scale production and indicated "[p]roduction in genetically modified CHO cells is an option already applied for the production of glucocerebrosidase." A3703.

From 1995 to the earliest filing date of the '712 patent, there were efforts to adapt known production processes for preparing significant quantities of the active precursor form of hGAA with an aim toward use in clinical trials. A3697. Two different processes were simultaneously developed. One process was based on transgenic mammals. A639-46, A652; *see also* A30, A42-44. The other process was based on recombinant CHO cells. A646-51; *see also* A35-37, A44, A47. These two methods were well documented in the literature well before 2000. A430; A638-39; *see also* A30. The contemporaneous literature expressed optimism that the use of CHO GAA in ERT would successfully treat Pompe patients.

The optimism in the prior art is consistent with statements regarding CHO cell produced hGAA attributed to Dr. Chen, Duke (Dr. Chen's employer), and/or

Synpac (a company collaborating with Dr. Chen and Duke). *See*, *e.g.*, A491; A536-42; A3778; A3767; A3765-66. These statements are also consistent with the testimony of BioMarin's witness, Dr. Pastores, who stated that at the critical date, he would have been surprised if ERT using CHO GAA did not work (A565; A53-55, A57). The testimony of the Duke/Synpac experts, on the other hand, is not consistent with the prior art and was not found to be persuasive by the Board. A37-38, A42, A53. Numerous publications and developments in the field demonstrated the widespread optimism that treatment of Pompe disease using GAA produced by both methods (transgenic mammals and CHO cells) would be successful.

A sampling of additional teachings and major developments related to the easy-to-follow drug development plan laid out in the Reuser "mini-review" is presented below:

| Year | Prior Art Teachings and Events |
|------|-------------------------------|
| 1996 | **Van Hove 1996** (co-author Dr. Chen) reported high-level production of CHO GAA. A536-37. |
| 1997 | **Reuser '771** described ERT for Pompe disease with GAA. A426. |
| Sept. 1997 | **The Duke Press Release** indicated that Duke obtained ODD for ERT for Pompe Disease and Dr. Chen "anticipated that recombinant enzyme injected into infants will be taken up by their muscle cells and restore normal glycogen levels." A3777-8. |
| Oct. 1997 | **Van Hove 1997** (co-author Dr. Chen) described large scale production and purification of CHO GAA. A491. |
| Feb. 1998 | **Kikuchi** (co-author Dr. Chen) administered CHO GAA and concluded "enzyme replacement with recombinant human GAA produced in CHO cells is a <u>promising therapy</u> for human Pompe disease. A3767; *see also* A3775-6. |

27

| Year | Prior Art Teachings and Events |
|------|-------------------------------|
| Dec. 1998 | A provisional patent application was filed that eventually issued as **van Bree '410.** A466. |
| May 1999 | **Synpac Press Release** announced the start of clinical trials using CHO GAA and reported "[i]t is anticipated that … the symptoms of Pompe disease may be alleviated." 3765. |

The overwhelming weight of the evidence supports the Board's conclusion that claims 1-9, 11, 12, 15, and 18-21 would have been obvious over Reuser '771 in view of Van Hove 1997, and van der Ploeg, Bembi, and/or Brady and the Board's finding that van Bree '410 anticipates claims 1-9, 12, 15, and 20-21 of the '712 patent. A61. If this Court finds that the Board's conclusions regarding obviousness are correct and must be affirmed, it will not need to reach a decision regarding the anticipation findings.

## STANDARD OF REVIEW

The ultimate construction of a claim is a legal conclusion that is reviewed *de novo*, while underlying factual determinations concerning extrinsic evidence are reviewed for substantial evidence. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279-80 (Fed. Cir. 2015). In determining its claim constructions, the Board considered and cited to the POR. *See* A28-29 (citing, *inter alia*, POR 54 (discussing Ex. 1012), POR 15, 22-24). The cited portions of the POR include extrinsic evidence, for example, page 22 of the POR cites to expert declarations. *Id.*; *see also* A267. Because the Board may have relied on both intrinsic and

extrinsic evidence, *de novo* review is not appropriate for all issues relating to claim construction.

Anticipation is a question of fact that is reviewed for substantial evidence. *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015). Under 35 U.S.C. § 102(b), a prior art reference will anticipate if it "disclose[s] each and every element of the claimed invention . . . arranged or combined in the same way as in the claim." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (citations and internal quotation marks omitted). "However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal*, 780 F.3d at 1381 (*quoting In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962)).

"Obviousness is a legal conclusion based on underlying findings of fact." *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009). The Board's determination of obviousness is reviewed de novo and the factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); *In re Gleave*, 560 F.3d at 1335. Relevant facts include the scope and content of the prior art, differences between the prior art and the claimed invention, level of ordinary skill in the field of the invention, and any relevant secondary considerations. *Graham v. John*

*Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (U.S. 1966). The presence or absence

of a reasonable expectation of success is a question of fact. *Par Pharm., Inc. v.*

*TWi Pharms., Inc.*, 773 F.3d 1186, 1196-97 (Fed. Cir. 2014).

A finding is supported by substantial evidence if a reasonable mind might

accept the evidence as sufficient to support the finding. *HP Inc. v. MPHJ Tech.*

*Invs., LLC*, 2016 U.S. App. LEXIS 6172 (Fed. Cir. Apr. 5, 2016).

## ARGUMENT

### I. The Board's Conclusions That Claims 1–9, 11, 12, 15, and 18–21 are Obvious are Supported by the Record and Duke/Synpac Have Failed to Show Any Error in the Board's Conclusions

The Board correctly held that claims 1-9, 11, 12, 15, and 18-21 were obvious

based on the overwhelming factual evidence and expert opinions. Except for claim

19, Duke/Synpac do not separately argue the dependent claims. Duke/Synpac's

arguments are directed to the disclosures and combination of Reuser '771 in view

of Van Hove 1997. D.I. 22 at 50-62. Thus, if Duke/Synpac's challenge to Reuser

'771 and Van Hove 1997 fails, then the obviousness of at least claims 1-9, 11, 12,

15, and 18-21 must be affirmed. Claim 19 also is obvious for reasons further

discussed below.

It is undisputed that Reuser '771 describes the production of hGAA in the

milk of transgenic animals for use in ERT for Pompe patients. A42, A428; *see also*

D.I. 22 at 14, 26. It is also undisputed that Reuser '771 states that CHO cells are an

alternative way to produce GAA. A43, A429-30; *see also* D.I. 22 at 26. The Board specifically found that "Reuser '771 suggests using, in its methods, rhGAA from sources other than milk of transgenic mice, including as produced in CHO cell culture." A47. Van Hove 1997 (co-author Dr. Chen) describes large-scale production and purification of recombinant precursor hGAA in CHO cells. A44, A47; A491. The Board found that there was a reason to combine these references, based on the shared disclosure of rhGAA produced in CHO cells and methods of treating Pompe disease (A47), and found a reasonable expectation of success based on the disclosures in the prior art (A50).

There is no requirement that a party's expert must provide an opinion on the ultimate issue of invalidity in order to assist the trier of fact. An expert's opinion may assist the trier of fact if it provides technical explanations, background on the state of the art, interpretations of the prior art, or any other guidance that would assist the trier of fact as required under F.R.E. 702. The main technical issue in this case is whether it was known or obvious to use CHO cells to prepare GAA to treat Pompe patients. BioMarin's production expert, Dr. Croughan, explained in his declaration that, in 2000, CHO cells were the most widely used production system for therapeutic proteins in 2000 and why CHO cells would be his first choice for producing GAA to treat Pompe disease. A623-26, A653-54. Dr. Pastores (a POSA) also explained why CHO cells would be the first choice. A562. Although neither

31

Dr. Croughan nor Dr. Pastores gave an opinion on the ultimate issues of

obviousness and anticipation of a particular patent claim, their testimony was

clearly relevant and helped the Board read the prior art and understand the state of

the art. Duke/Synpac implicitly agreed with this when they failed to move to strike

either expert's declaration. A61. In view of the substantial relevant evidence and

testimony from both parties, expert opinion on the ultimate issue of invalidity that

parroted the Petition was not necessary.

### A.    Treating a Pompe Patient with CHO GAA Was Obvious Because Production of hGAA in CHO Cells Was a Known and Predictable Solution to the Manufacturing Need

Van Hove 1997 and others disclosed that the problem to be solved in order

to confirm the effectiveness of GAA to treat humans in clinical trials was the

preparation of large quantities of purified GAA. A491. Van Hove 1997 also

described a solution to this problem, which was the production of GAA in CHO

cells and subsequent large scale purification. A491-493.

Dr. Croughan (a researcher with considerable experience in the large scale

production of recombinant therapeutic proteins) and Dr. Pastores (a medical doctor

and a POSA at the relevant time) both explained why CHO cells would be the first

choice for production of GAA at the relevant date as compared with tgGAA.

A623-32, A652-54; A562-64. The Board analyzed all of the prior art and expert

opinions before deciding that "an ordinary artisan reading Reuser '771, in view of

32

Van Hove 1997, with knowledge of Van Hove 1996, Canfield and other references discussed herein, would have had reason to use rhGAA produced in CHO cells, as taught by Van Hove 1997, in the methods disclosed in Reuser '771, and would have had a reasonable expectation of success in doing so, in view of those references." A50.

### B.    Dr. Chen and Others Touted the Virtues of Using hGAA Produced in CHO Cells in ERT for Pompe Patients

There was clear motivation for combining Reuser '771, which described administering either tgGAA or CHO GAA, with Van Hove 1997, which focused on the production and purification of CHO GAA. A47. Both references discussed rhGAA produced in CHO cells and methods of treating Pompe disease. *Id.* A POSA would recognize the value of using CHO cells to produce GAA. Multiple publications by Dr. Chen touted the virtues of CHO GAA for treating Pompe disease. A536; A491; A3767. As summarized in the preceding section and as discussed in detail in Sections II.C.3. and II.C.2. above, BioMarin's witnesses, Drs. Croughan and Pastores, also testified as to the advantages of CHO GAA. Thus, there was clear motivation for using CHO cells as compared transgenic mammals to produce hGAA for ERT for Pompe patients. A553, A560-63; A623-30, A646-555.

Applying *KSR Int'l. Co. v. Teleflex Inc.*, 550 U.S. 398, 415-6 (2007) to the facts of this case:

> When there is a design pressure **[efficient production of rhGAA]** or market pressure **[ERT for Pompe disease]** to solve a problem **[large scale production of GAA for clinical trials]**, and there are a finite number of identified, predicable solutions **[production by transgenic mammals or CHO cells]**, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.

(emphasized and bracketed material added). The Board correctly concluded that, based on the overwhelming evidence prior to the critical date, a POSA would administer CHO cell produced hGAA to Pompe patients using dosages and treatment administration intervals disclosed in the art. A44-50.

Duke/Synpac try to counter the overwhelming weight of the evidence by referring to a Canfield patent application that was published in 2003, after the critical date, as "other relevant art." D.I. 22 at 53. Duke/Synpac argues that: "Canfield '785 reported that the hGAA from CHO cells used in Van Hove 1996 (which is prepared from the same cell line as in Van Hove 1997, *see* A492) contained hardly any of the M6P…" D.I. 22 at 53.

After considering this characterization of the art, which is inconsistent with Dr. Chen's own publications, the Board concluded, "we do not know from the record what exact 'preparation was obtained' by Dr. Canfield" and noted, "we do not agree with Patent Owner's characterization." A49-50, A36.[2] The Board was

---

[2] In addition, Dr. Canfield admitted in a deposition contemporaneous to this IPR that he did not know how the preparation that he "obtained" was made. A3904-05.

also not persuaded by Duke/Synpac's argument that "Canfield indicates that an

ordinary artisan would have known that the administration amounts and intervals

disclosed in van Bree '410 would have been inapplicable to hGAA produced in

CHO cell cultures." A36. After considering all of the evidence and testimony

relating to Canfield, the Board concluded the exact opposite of Duke/Synpac's

assertion, *i.e.*, that "Canfield indicates that hGAA produced in CHO cells would

work in methods for treating lysosomal storage disease, as does Van Hove 1996

[co-author Dr. Chen] in relation to Pompe disease in particular." A49-50, A38.

### C.   There Was Overwhelming Acceptance of the High Expectation that Administering hGAA Produced in CHO Cells Would Successfully Treat Pompe Disease

Prior to 2000, it was demonstrated and accepted that the precursor form of

GAA could be produced in a form that could be taken up by human cells. *See*

A565, A576-78. CHO GAA and tgGAA are functionally equivalent with no

observable or meaningful differences in the ability to treat patients. A455 at lines

8-18; A553, A561-62; A641-41; A3786. This court has recently affirmed a holding

of obviousness where the claimed drug was enabled by the prior art and the

claimed drug and the prior art drug were "clinically interchangeable." *Spectrum*

*Pharm. Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1335-36 (Fed. Cir. 2015).

Duke/Synpac discuss Van Hove 1996 and Canfield in a further attempt raise

an issue regarding reasonable expectation of success. D.I. 22 at 58-59. However,

Van Hove 1996 concludes:

> Recombinant acid α-glucosidase joins a growing list of recombinant lysosomal enzymes produced in CHO cells that exhibit <u>high uptake mediated by the mannose-6-phosphate receptor</u>. The decrease of both lysosomal and cytoplasmic glycogen with enzyme treatment and the <u>strikingly increased enzyme levels in the heart</u> following intravenous injection illustrate the potential of this recombinant enzyme for *in vivo* targeting and correction of affected tissues in Pompe disease.

A541 (emphasis added). After considering conflicting testimony of expert witnesses regarding Van Hove 1996 and Canfield (discussed in Section II.D.2. above), the Board determined that "we do not agree with Patent Owner's characterization of those references." A49.

It is further noted that Pharming obtained ODD for tgGAA in 1996 (A3871) and Duke obtained ODD for CHO GAA in 1997 (A3777). In order to obtain ODD, the applicant must include "a discussion of the scientific rationale for the use of the drug for the rare disease or condition." 21 C.F.R. 316.20. The FDA will refuse to grant an ODD if "[t]here is insufficient information about the drug, or the disease or condition for which it is intended, to establish a medically plausible basis for expecting the drug to be effective in the prevention, diagnosis, or treatment of that disease or condition." 21 C.F.R. 316.25(a)(2)); *see also* A4022.

Bijvoet reported in 1998 that tgGAA produced in mouse milk gave results similar to CHO GAA and the "enzyme activity in heart and skeletal muscle samples increased from <3% to >12%." (*see* A3786, under "*In vivo*," discussing

36

results in Table 4, A3785). Also in 1998, Pharming/Genzyme announced Pompe

patients had been treated, and Reuser observed, "a realistic and promising attempt

at [ERT] for GSDII will be taken." A3872-74; A3727.

The following statements by Duke/Dr. Chen/Synpac also support the high

expectation of success (a) in 1997, Duke obtained ODD for CHO GAA (A3777);

(b) in 1998, Duke announced that it had developed a "promising therapy" for

Pompe disease, citing studies in Japanese quail (A3776), and Dr. Chen concluded

CHO GAA "can target to muscle and produce muscle improvement" (A3767); and

(c) in June 1999, Synpac announced that clinical trials had begun using CHO GAA

and that "symptoms of Pompe disease may be alleviated" (A3765, ¶ 2). It bears

repeating, Dr. Chen simply followed the drug development plan laid out by Reuser

in 1995 (*see* Summary of Argument above), and the expected success was realized.

Not only is the Duke/Synpac argument that there was no reasonable expectation of

success (D.I. 22 at 57-60) scientifically unsupportable, it is belied by the express

statements and actions of Duke, Synpac, and Dr. Chen prior to 2000.

While some prior art noted that clinical trials would **confirm** the efficacy of

the CHO GAA**, not one person ever expressed serious doubts that it would

work!** "Conclusive proof of efficacy is not necessary to show obviousness. All that

is required is a reasonable expectation of success." *See Hoffman-La Roche Inc. v.

Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014) (citing *PharmaStem*

37

*Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007);

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007)). Scientific

evidence and common sense leads to the inevitable conclusion that a POSA would

have had a reasonable expectation that administration of CHO GAA to a Pompe

patient would be an effective therapy. Nothing more is required.

The Board properly analyzed the record in concluding the claims were

obvious. As noted in *Wyers*, *KSR* and other Federal Circuit cases "establish that the

legal determination of obviousness may include recourse to logic, judgment, and

common sense, in lieu of expert testimony." *Wyers v. Master Lock Co.*, 616 F.3d

1231, 1240 (Fed. Cir. 2010). The cases mentioned in *Wyers* evaluated the need for

expert testimony for "laypersons." *Id.*[3] However, as mandated by 35 U.S.C. § 6(a),

"administrative patent judges shall be persons of competent legal knowledge and

**scientific ability**." (emphasis added). Administrative patent judges (APJs) are not

laypersons and are fully capable of deciding the ultimate issue of patentability,

especially in a case such as this, where BioMarin's experts provided helpful

technical testimony and the prior art overwhelmingly supports only one reasonable

conclusion.

---

[3] The expert opinions considered as necessary by Duke/Synpac's cited cases did not include opinions on the ultimate issue, *i.e.* the claim is obvious, and instead evaluated the need for technical guidance, *i.e.* support for motivation to combine. *See* D.I. 22 at 51. The record is replete with technical guidance from BioMarin's expert witnesses.

The Board's factual findings and legal conclusions in its FWD were supported by substantial evidence and were the only conclusion a reasonable mind would take away from the IPR record. A47-50. As Duke/Synpac have not presented separate arguments for non-obviousness regarding claims 2-9, 11, 12, 15, 18, 19, and 21, the Board's Decision that these claims would have been obvious must be also affirmed.

### D.    Claim 9 Is Obvious Under the Board's Claim Construction of "Precursor" and Under Duke/Synpac's Improper Construction

Regarding claim 9, even under Duke/Synpac's improper, narrow construction (*see* Section II.D. below for further discussion), claim 9 is still obvious. Duke/Synpac have not argued separately that there was error in concluding that claim 9 is obvious. Duke/Synpac's proposed, improper, narrow construction would require administration of only precursor GAA and no other forms of GAA. But, both of BioMarin's witnesses testified that the highly purified active precursor form should be administered to patients. A641, A646; A561 at ¶ 58. The prior art disclosed purification of the 110 kD precursor form of GAA. A491-95. It would be obvious to use only the active precursor form, which was previously known, and there is no evidence to support an argument that the ability to administer solely precursor GAA was unexpected or not obvious to try.

### E.    Prophylactic Administration of Immunosuppressants was a Common Sense Solution to Expected Immune Responses Informed by the Experience with Other Therapeutic Proteins

Duke/Synpac presented separate arguments regarding claim 19. Claim 19 requires that an immunosuppressant is administered prior to any administration of the GAA to the patient. A6-7. Duke/Synpac argue that there is no motivation to combine Brady with Reuser '771 and Van Hove 1997. D.I. 22 at 63. However, the Board noted in the Rehearing Decision that "Brady discusses the use of the immunosuppressant cyclophosphamide to manage enzyme neutralizing antibodies when treating Gaucher's disease patients" and "Brady also expressly discloses that '[i]t is also likely that this technique may be helpful when enzyme replacement therapy is attempted in patients with other disorders in which genetic mutation abrogates the production of the protein (CRIM-negative individuals).'" A3-4. The Board found that a POSA would have known of the problem of an unwanted immune response when administering an exogenous enzyme, such as GAA, from any source. A4, A56-58; *see also* A3590 at 135:16-22, A3591 at 136:10-14; A575-76.

Dr. Wasserstein, Duke/Synpac's expert, testified that prior to 2000, adverse immunological reactions occurred when using therapeutic proteins. A3590 at 135:16-22, A3591 at 136:10-14. A POSA would have been aware of the problem of possible immune response to therapeutic proteins, including GAA, prior to the

40

critical date; Duke/Synpac has provided no evidence to the contrary. The anticipation of a possible immune response would have motivated doctors to prophylactically treat immune responses, including prior to the first administration of any GAA. Dr. Pastores confirmed Dr. Wasserstein's testimony that adverse immune reactions were known to occur with therapeutic proteins prior to July 1999. A56-57.

Additionally, the treatment of Pompe disease with hGAA would have been informed by the clinical experience with Gaucher's disease. A54-55 (citing A571-2 at ¶ 86). The Reuser mini-review also indicated "[f]ollowing these same basic principles [learned from Gaucher's disease] we started to develop models for (re)testing … the potential effect … to patients with α-glucosidase." A3703.

In the Rehearing Decision, the Board framed the issue regarding claim 19 as "whether it would have been obvious to administer an immunosuppressant as a prophylactic, before any sign of adverse immunological reaction." A10. The Board then referred to Dr. Pastores' testimony:

> . . . it would not be surprising if a proportion of patients treated with a recombinant GAA protein developed an immune response to the recombinant enzyme. In patients with high titers of antibodies against the enzyme, particularly those with neutralizing antibodies, administering an immunosuppressant prior to, with or immediately after the therapeutic enzyme would be considered to mitigate the presence of antibodies and its negative impact (Brady et al., *Pediatrics*, 100(6):E11, 1997, Ex 1012). For example, Brady et al. discuss on page 3 of 4, beginning at left column, final paragraph, efforts to "immunosuppress" the patient. Similarly, Grabowski reports

41

that hypersensitivity to the replacement enzyme may be addressed by pretreatment with antihistamines or the widely used immunosuppressant, corticosteroids. (Grabowski et al., *Blood Reviews*, 12:115(1998), Ex 1011; p 130, left column, first paragraph) If there is a high incidence of patients developing high antibody titers, an immunosuppressant could be administered prophylactically prior to any administration of the recombinant enzyme begins to minimize the potential adverse effects of such.

A11 (citing A575-76).

Duke/Synpac did not challenge the scientific basis or logic of Dr. Pastores' testimony on this point before the Board (A11) and do not make such a challenge on appeal. The Board, after fully considering all the evidence, held that:

> Under *KSR*, we conclude that Petitioner's proposed combination of elements from Reuser '771, Van Hove 1997, and Brady would have been obvious to a person of ordinary skill in the art. The choice of administering immunosuppressant before an adverse immune response develops in a patient, or after a patient has experienced an adverse immune response, are predictable variations producing the same result—prevention of an adverse immune response to foreign protein. There is no evidence of record demonstrating that the prophylactic treatment of an adverse immune response in response to GAA administration was uniquely challenging or difficult for one of ordinary skill in the art. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) (alleged invention obvious in view of what "common sense" would tell the skilled artisan); *KSR*, 550 U.S. at 417 ("predictable variations" are not patentable).

A13.

Duke/Synpac argues that there is no substantial evidence in the record to affirm the Board's holding regarding claim 19 and that the testimony of Dr. Pastores is merely conclusory. D.I. 22 at 65. Duke/Synpac focuses on Dr. Pastores' statement that "*[i]f* there is a high incidence of patients developing high antibody

titers, an immunosuppressant *could be* given prophylactically prior to any administration of the recombinant enzyme begins to minimize the potential adverse effects of such." *Id.* (citing A575-76).

However, in 2000, all the elements of claim 19 were known in the art: Pompe disease, ERT, hGAA produced in CHO cells, and immunosuppressants. The only question is whether it would have been obvious for a POSA to arrange the elements in the specific manner recited in claim 19. It is not contested that immunosuppressants had been given to patients with Gaucher's disease. Taking the first administration as a point of reference, there are only two choices for the first administration of the immunosuppressant, prior to or after the first administration of GAA. A13 ("before" or "after"). The Board held that "the prophylactic administration of an immunosuppressant would have been a predictable variation of the use of immunosuppressant discussed in Brady." A12. When there are a "finite number of identified, predictable solutions," it is obvious to select a particular dosing schedule. *See Hoffmann-La Roche v. Apotex*, 748 F.3d 1326, 1332-3 (Fed. Cir. 2014) (citing *KSR*, 550 U.S. at 421).

Duke/Synpac argue that at the relevant time there had been no reports of patients developing an immune response to hGAA. D.I. 22 at 66. However, in 2000, Duke had just started the first clinical trials using CHO GAA on a small number of patients and the results were first reported in the patent at issue. The

43

record establishes that immune responses were expected. Duke/Synpac have no evidence that treating a patient with an immunosuppressant involved any technical challenges or resulted in any unexpected results.

The prior administration of immunosuppressant is obvious. The record shows that a POSA would reasonably predict that an adverse immune reaction may occur (A11) and would want (*i.e.,* be motivated) to prevent that adverse immune reaction. A56-59. The Board weighed conflicting evidence on this issue and concluded "Dr. Pastores' testimony in this regard is more persuasive." A57. The Board's factual findings regarding the teachings of the prior art are supported by substantial evidence. With regard to the ultimate legal conclusion of obviousness, a patent should not be granted based on the implementation of a common sense and obvious solution to a known or anticipated problem; there is no error in the Board's decision and it must be affirmed.

## F.     The Board Properly Weighed Secondary Considerations and Correctly Found Duke/Synpac Failed to Prove Nexus

As noted in the FWD, "[a]ll types of objective evidence of non-obviousness must be shown to have nexus." A59 (citations omitted). The Board found that Duke/Synpac failed to prove a nexus between any of the alleged secondary considerations and the '712 patent. A60. On appeal, Duke/Synpac does not offer any evidence or record citations to dispute the failure to establish a nexus; they instead take the position that a presumption of nexus should apply for commercial

success. D.I. 22 at 61. Duke/Synpac does not separately appeal the lack of nexus for the other secondary considerations it argued below, including long-felt need and failure by others, unexpected results, licensing, and praise by others. *Compare* D.I. 22 at 60-62 *to* A59-60.

While the cases cited by Duke/Synpac note the existence of a possible presumption of nexus for commercial success, those two cases actually support the Board's conclusion. D.I. 22 at 60-62. In both *SightSound* and *Mettke*, the Federal Circuit affirmed that patent owners failed to meet the burden of showing that the alleged commercial success is due to the claimed invention. *SightSound Techs., LLC v. Apple, Inc.*, 809 F.3d 1307, 1319 (Fed. Cir. 2015); *In re Mettke*, 570 F.3d 1356, 1361 (Fed. Cir. 2009). Here, the Board noted that "Patent Owner does not discuss or address whether other patents or intellectual property might have been involved in the 'two significant rights transfers' mentioned by the Patent Owner" and "Patent Owner does not show adequately a nexus between what is recited in the challenged claims of the '712 patent in particular and the commercial success of Myozyme/Lumizyme." A60. The record shows that the agreements licensing the '712 patent included much more than patent rights. A2147; A2314-6; A3097. Duke/Synpac fails to offer any evidence that the commercial success of Myozyme/Lumizyme is the direct result of the unique characteristic of the claimed invention and not the result of other factors or intellectual property.

*Therasense* holds that there is no presumption of nexus where several patents cover a marketed product. *Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1289, 1299 (Fed. Cir. 2010), *vacated for en banc rehearing on inequitable conduct*, 374 Fed. Appx. 35 (Fed. Cir. 2010). Like *Therasense*, this is not a situation where the success of a product is attributed to a single patent. *Id.* There are at least four "protective" U.S. patents for Myozyme/Lumizyme. A3789-805. Duke/Synpac have not distinguished the contributions of each patent to Myozyme/Lumizyme. The presumption does not apply.

In addition, "if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006). As explained above, the method of treating Pompe patients using hGAA for ERT was well known prior to the '712 patent. The Board found that claims 1-9, 12, 15, 20-21 of the '712 patent are anticipated by van Bree '410 (A30-42), which is listed as one of several patents that protect Myozyme/Lumizyme. A3876-77. The Reuser patent identified as protecting Myozyme/Lumizyme claims priority to the same provisional as Reuser '771. A3789; A426.

Based on Genzyme's statements in its 10-K and taking into consideration the common aspect of the "protective" patents, the feature that creates commercial success is using hGAA for ERT in Pompe patients. *Id.* If the '712 patent solely

46

provided the feature that creates commercial success for Myozyme/Lumizyme then Genzyme would not need to identify *three* other prior patents that protect the products. *Id.* The record is devoid of any evidence that production in CHO cells, which were known as the most popular cell line for producing therapeutic proteins, was responsible for the products' commercial success. The drugs were commercially successful because FDA approval was obtained and sufficient quantities of the drug were available. There is no nexus between the claims at issue and the products.

The Board correctly concluded that there was no nexus shown in the record for any secondary consideration alleged by Duke/Synpac. A59-61. Duke/Synpac have not presented any persuasive evidence or arguments to the contrary.

**G.    Claims 1–9, 11, 12, 15, and 18–21 of the '712 Patent are Obvious**

The Board correctly held that claims 1-9, 11, 12, 15, and 18-21 are obvious over Reuser '771 in view Van Hove 1997, and van der Ploeg, Bembi and/or Brady. A61. If this Court determines that the obviousness holdings should be affirmed, then there is no need to reach a decision regarding Duke/Synpac's challenge to the alternative holding of the Board that certain claims are also invalid based on anticipation, discussed below.

## II. Van Bree '410 Anticipates Claims 1-9, 12, 15, 20-21 of the '712 Patent Based on its Disclosure of a Method of Treating Pompe Patients Using hGAA from Multiple Sources Including CHO Cells

The Board held that van Bree '410 anticipates claims 1-9, 12, 15, and 20-21. A39-42. BioMarin's Petition and experts provided sound opinions based on the facts disclosed in the prior art based on the relevant date of July 2000. A reasonable mind would accept the record evidence as sufficient to support the Board's finding. *See HP Inc.*, 2016 U.S. App. LEXIS 6172.

A reference is anticipatory when it satisfies particular requirements. *In re Gleave*, 560 F.3d at 1334. First, the reference must disclose each and every element of the claimed invention, either explicitly or inherently. *Id*. (citing *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). The elements of the prior art must be arranged or combined in the same manner as in the claim at issue, but the reference need not satisfy an *ipsissimis verbis* test. *Id.* (citing *In re Bond*, 910 F.2d 831, 832-33 (Fed. Cir. 1990)). Second, the reference must "enable one of ordinary skill in the art to make the invention without undue experimentation." *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). As long as the reference discloses all of the claim limitations and enables the "subject matter that falls within the scope of the claims at issue," the reference anticipates — no "actual creation or reduction to practice" is required.

48

*Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380-81 (Fed. Cir. 2003);

*see In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).

### A. The Board's Final Written Decision on Anticipation is Supported by Not Only Substantial But Overwhelming Evidence

It is undisputed that van Bree '410 discloses the production and

administration of hGAA to human patients. D.I. 22 at 41; *see also* A466, A475-90.

It is also undisputed that van Bree '410 further discloses that given the success in

the Examples, "it is possible that other sources of human alpha-glucosidase, such

as resulting from cellular expression systems, can also be used" and "an alternative

way to produce human acid α-glucosidase is to transfect the acid α-glucosidase

gene into a stable eukaryotic cell line (e.g., CHO) as a cDNA or genomic construct

operably linked to a suitable promoter." *Id.*; *see also* A481 at 13:53-61. The

Examples disclosed in van Bree '410 included clinical trials using hGAA,

including the administration of hGAA to healthy male volunteers and three

prophetic example clinical trials of the "safety and efficacy" of rhGAA as ERT on

Pompe patients. A482-84, A486-87; *see also* A30.

Van Bree '410 also discloses that "[t]he post translational processing of

natural [hGAA] and of recombinant forms of [hGAA] as expressed in cultured

mammalian cells like COS cells, BHK cells and CHO cells is similar" and "[t]he

restoration of the endogenous acid α-glucosidase activity by acid α-glucosidase

isolated from mouse milk was as efficient as restoration by acid α-glucosidase

49

purified from bovine testis, human urine and medium of transfected CHO cells."
A477, A484.

The basic factual issue regarding van Bree '410 is whether or not it describes a method of treating a patient having Pompe disease <u>using GAA produced in CHO cell cultures</u>. In its analysis, the Board explained why the testimony of Genzyme's experts did not compel a conclusion that descriptions in van Bree '410 regarding administration amounts and intervals would apply only to hGAA produced in transgenic mice, but not hGAA produced in CHO cells. A37-39. The Board held van Bree '410 "describes administering hGAA produced in CHO cell cultures to patients in the same manner, i.e., using the same amounts and dosage intervals, as described for hGAA produced in transgenic animals." A37.

A comparison of the similarities and differences between claim 1 of the '712 patent and claim 1 of van Bree '410 is informative:

| Claim 1<br>'712 Patent | Claim 1<br>van Bree '410 |
|---|---|
| A method for treating glycogen storage disease type II in a human individual having glycogen storage disease type II, comprising | A method of treating a human patient with Pompe disease, comprising |
| administering to the individual a therapeutically effective amount of human acid α-glucosidase periodically at an administration interval, | intravenously administering biweekly to the patient a therapeutically effective amount of human acid alpha glucosidase, whereby the concentration of accumulated glycogen in the patient is reduced and/or further accumulation |

50

| Claim 1<br><br>'712 Patent | Claim 1<br><br>van Bree '410 |
|---|---|
|  | of glycogen is arrested |
| wherein the human acid α-glucosidase was produced in chinese hamster ovary cell cultures. | [van Bree '410 broadly claims methods of hGAA production, including CHO cell production.] |

The <u>only difference</u> between claim 1 of the '712 patent and claim 1 of van Bree '410 is that the '712 patent claims were limited to hGAA produced by CHO cells.

Van Bree '410 discloses methods of treating a Pompe patient by administering a therapeutically effective amount of hGAA. A475 at 2:33-36. It further discloses that the treatment dosages could be administered on a single occasion per week or on three occasions per week with the option of varying amounts for first, second, third, and fourth dosages. A475-76 at 2:39-42, 2:56-3:11. Van Bree '410 further discloses that the hGAA administered to the Pompe patient can be produced in CHO cells. A481 at 6:11-16, 13:58-60, 20:32–37. No elements of the challenged claims are missing.

Duke/Synpac submitted declarations of Drs. Wasserstein and Cummings addressed the anticipation ground. BioMarin's Reply further addressed the anticipation ground and argued that van Bree'410 anticipated the instituted claims under the Board's claim construction. A311-14.

## B.  The Board Correctly Found That van Bree '410 Anticipates Claims 1-9, 12, 15, and 20-21

It is clear from the above chart and discussion that van Bree '410 describes all of the limitations of claim 1. Duke/Synpac's repeated critique of the Board's decision is that van Bree '410 allegedly does not disclose administering hGAA derived from CHO cells to human Pompe patients in a therapeutically effective amount, periodically at administration intervals, as required by the '712 patent's independent claims. D.I. 22 at 41-44. Duke is essentially arguing that for anticipation, van Bree '410 must disclose that the claimed method was actually performed. However, for anticipation, it is sufficient that the prior art contains an enabling disclosure. Actual reduction to practice in the prior art is not necessary, *In re Montgomery*, 677 F.3d 1375, 1382 (Fed. Cir. 2012). The Board correctly found that van Bree '410 anticipated the challenged claims.

This was not the case of a mere possibility.[4] Van Bree '410 explicitly disclosed the administration of hGAA to human patients in a therapeutically

---

[4] Duke's reliance on the *SmithKline Beecham* case is misplaced. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F. 3d 1331, 1346 (Fed. Cir. 2005); *see also* D.I. 22 at n.7. In *SmithKline Beecham*, the Court cited a CCPA case, *In re Seaborg*, 51 C.C.P.A. 1109, 328 F.2d 996 (CCPA 1964). The claims at issue in both of those cases were product claims that recited very specific compounds, not method claims like those of the '712 patent. *Id*. The *MEHL* case also is not on point. *See MEHL/Biophile Intern. Corp. v. Milgraum*, 192 F. 3d 1362, 1365 (Fed. Cir. 1999); *see also* D.I. 22 at n.7. In that case, the parties agreed that the prior art manual did not discuss hair follicles, let alone aligning the laser vertically over a

effective amount, periodically at administration levels. A466; A486-88. In addition, van Bree '410 disclosed different ways of producing the hGAA to be administered, including the methods of isolating rhGAA from the milk of transgenic mice and producing rhGAA using CHO cells. A481-84, A486-87; *see also* A30.

Van Bree '410 examples further support the Board's decision. Example 5 discloses the administration of hGAA to healthy male volunteers and three prophetic examples of clinical trial of the "safety and efficacy" of rhGAA as ERT on Pompe patients. A482-84, A486-87; *see also* A30. The first disclosed clinical trial for Pompe patients includes four infantile patients and three juvenile patients. A487. A phase II clinical trial is also disclosed with various parameters for measuring efficacy and safety. *Id*. The third clinical trial is disclosed for juvenile patients with safety parameters, primary efficacy, secondary efficacy, and quantitative objective parameters. *Id*.

The inclusion of prophetic examples of clinical trials for Pompe patients with the disclosure of rhGAA actually given to healthy volunteers further demonstrates the substantial evidence that supported the Board's decision. The

---

hair follicle opening. *Id*. In this case, van Bree '410 describes "methods of treating Pompe's disease using human acid alpha glucosidase," where a "preferred treatment regime comprises administering greater than 10 mg/kg body weight per week to a patient." A466; *see also* A30.

rhGAA would not have been given to healthy patients unless it was ready to be administered to Pompe patients.

There is no requirement that van Bree '410 include an explicit, verbatim recitation of the challenged claims in a single sentence or paragraph in order to anticipate the claims. *Gleave*, 560 F.3d at 1334. The Board was entitled to rely on its own factual determinations regarding the prior art, to weigh the expert testimony, to find that a POSA would have understood that all elements of the challenged claims were disclosed by van Bree '410 and that the claims were anticipated by van Bree '410. *See*, *e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1074 (Fed. Cir. 2015). The Board correctly found that claims 1-9, 12, 15, and 20-21 of the '712 patent are anticipated by van Bree '410.

In a PTAB trial, the APJs constituting a particular panel act as fact finders and also as judges of the ultimate legal issues presented. The Board is free to independently assess the teachings of the prior art, with or without reliance of expert testimony from witnesses of either party. A judge may decide the legal issue of validity unaided by expert opinion. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988) (citing *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1547-8 (Fed. Cir. 1984) (expert testimony "may" be "helpful"); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed.

Cir. 1986) (argument expert testimony is required "borders on the frivolous"), rev'd

on other grounds, 872 F.2d 407 (Fed. Cir. 1989).

> **C.     There Was No *Ultra Vires* Conduct by the Board Because the Petition Specifically Included an Anticipation Ground for Claims 1-9, 11-12, 15, and 20-21 Based on van Bree '410**

It is undisputed that BioMarin's Petition included a specific ground alleging

that van Bree '410 anticipated claims 1-9, 11-12, 15, and 20-21.[5] A146-50. This is

not a case where there was *ultra vires* conduct by the Board. *Cuozzo* is

distinguishable from the case at hand because in *Cuozzo*, the Board instituted an

IPR for claims 10, 14, and 17 on a ground the Petition asserted for claim 17 only.

*In re Cuozzo*, 793 F.3d at 1272. Regardless of the outcome of the Supreme Court's

review of *Cuozzo*, there is no *ultra vires* conduct here that would require reversal

of the anticipation decision because the anticipation ground was raised in the

Petition, adopted by the Board in the Institution Decision, and fully litigated by the

parties.

---

[5] The Petition and the claim chart as a whole demonstrated every challenged claim element of claims 1-9, 11-12, 15, and 20-21 of the '712 patent were anticipated by van Bree '410. A146-50; A182-84. Any allegedly missing elements in the claim chart were disclosed in the content of the Petition and various dependent claims that correspond to elements in claim 1. *Id.*

**D.    The Board's Claim Construction Regarding Claim 9 is Proper and there are No Internal Inconsistencies in the FWD when the Board's Actual Construction of Precursor is Applied**

The only claim construction at issue in this appeal is the meaning of the term "precursor" in claim 9. Duke/Synpac's argument on this issue is based an erroneous assertions that the Board held that "precursor" referred to exclusively a precursor of rhGAA. D.I. at 46-48. Failure on this assertion dooms Dukes argument. Duke/Synpac is wrong in its assertion that Board held that "precursor" referred to exclusively a precursor of rhGAA. Under the heading "*A. Claim Construction*", A26, the Board construed "precursor" in claim 9 under the subheading "*2. Precursor*" of rhGAA". A29. In this section, the Board construed precursor in claim 9 as meaning any precursor of recombinant hGAA (e.g. a 110-kD form) that is exclusively produced in CHO cell cultures. A29.

When construing claim 9, the Board cited to Duke/Synpac's POR for <u>part</u> of the construction. *Id*. However, the Board did not adopt the entirety of the cited passage from Duke/Synpac's POR. *Id*. This was made clear by the use of ellipses and reinforced by the repeated statements that claim 9 was being construed "as encompassing administering both precursor and non-precursor forms of rhGAA at the same time, and not limited to administering exclusively a precursor form and no other form." A39-40; *see also* A29, second paragraph.

56

Ellipses are used to denote an intentional omission. The Chicago Manual of Style, § 13.48 (16th ed. 2010) (Ellipses defined. An ellipsis is the omission of a word, phrase, line, paragraph, or more from a quoted passage); The Bluebook, A Uniform System of Citation, §5.3 (Eighteenth Edition 2005) ("Omission of a word or words is generally indicated by the insertion of an ellipses"). In the FWD, the Board used ellipses to clarify that the omitted phrase was not included in its construction of "precursor." A29. The omitted phrase was originally part of a full sentence in the POR as:

> "The broadest reasonable interpretation of administering hGAA that 'is a precursor of recombinant human acid alpha-glucosidase that has been produced in chinese hamster ovary cell cultures' is administering exclusively <u>a precursor of recombinant hGAA that has been</u> produced in CHO cell cultures."

A267 (omitted part is underlined); *see also* A29.

Therefore, while the Board agreed that "precursor" in claim 9 means "any precursor of recombinant hGAA (e.g. a 110-kD form) that is <u>exclusively produced in CHO cell cultures.</u>" A29 (emphasis added). The Board did not adopt Duke/Synpac's additional restriction that limited the claim to administration of exclusively a precursor of recombinant hGAA and no other forms of hGAA. A29. For example, the Board stated, "[w]e clarify, however, that claim 1, upon which claim 9 depends, recites a method *comprising* administering hGAA." A29 (emphasis in original). The Board repeatedly stated that claims 1 and 9 "encompass

administering both precursor and non-precursor forms at the same time, and are not limited to administering exclusively a precursor form and no other form," both within the claim construction section (*id.*) and in subsequent analysis (A39-40).

Duke/Synpac misinterprets the FWD and the Board's specific, and repeated, construction of the term "precursor" in claim 9. Duke/Synpac's citation of the FWD's page A39 ignores the statement in the very next paragraph addressing why the Board did not agree with Duke/Synpac's contention that claim 9 was limited exclusively to a precursor of rhGAA. D.I. 22 at 46-47; A39.

Because Duke/Synpac's argument regarding the Board's alleged error with regard to claim 9 is based on an incorrect statement of the Board's claim construction of "precursor," the rest of Duke/Synpac's argument fails.[6] *See* D.I. 22 at 46-50. The Board did not act inconsistently and did not negate its own ruling.

However, it is noted that Claim 9 is a dependent claim; therefore, unlike claim 1, claim 9 requires that the GAA that is administered includes at least some GAA that is in the precursor form. Nothing in the language of claim 9, the specification of the '712 patent, or the prosecution history suggests that the administered GAA must consist exclusively of GAA in the precursor form to the

---

[6] Because the Board <u>did not</u> construe the term "precursor" to include "*exclusively* a precursor of recombinant hGAA," the *Dippin' Dots* case is irrelevant. *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) (claim construction specifically included exclusion).

exclusion of other forms. The Board correctly construed the claim term "precursor" and correctly applied that construction to find that claim 9 was anticipated by van Bree '410. A29, A39-40.

Duke/Synpac improperly takes the position that claim 9 should be limited to the administration of exclusively a precursor form of GAA and no other form. D.I. 22 at 20-21, 29. 46-50. However, Duke/Synpac does not offer any evidentiary support in this appeal as to why the Board should have held that "precursor" referred to exclusively a precursor of rhGAA. *Id*. There is nothing in the record that supports Duke/Synpac's proposed claim construction of "precursor" in the context of the claim as a whole. A29, A39-40. The Board's claim construction and finding that van Bree '410 anticipates claim 9 of the '712 patent must both be affirmed.

## CONCLUSION

In conclusion, because there were no legal errors in the decisions of the

Board and because the factual findings are supported by substantial evidence, the

decisions must be affirmed.

Dated: May 27, 2016          Respectfully submitted,

                    /s/Gerald M. Murphy, Jr.

                    Gerald M. Murphy, Jr.
                    BIRCH STEWART KOLASCH & BIRCH, LLP
                    8110 Gatehouse Road, Suite 100 East
                    Falls Church, VA 22040-0747
                    Telephone: (703) 205-8000

                    Attorneys for BioMarin Pharmaceutical Inc.

# United States Court of Appeals
# for the Federal Circuit

*Duke University v. Biomarin Pharmaceutical, Inc.*, No. 2016-1106

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by BIRCH, STEWART, KOLASCH & BIRCH, LLP, attorneys for Appellee to print this document. I am an employee of Counsel Press.

On **May 27, 2016,** counsel has authorized me to electronically file the foregoing **Brief for Appellee, Biomarin Pharmaceutical, Inc.**, with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

| | |
|---|---|
| Steven A. Zalesin (principal counsel) | John P. White |
| Eugene M. Gelernter | Cooper & Dunham LLP |
| Irena Royzman | 30 Rockefeller Plaza, 20th Floor |
| Charlene Choi | New York, New York 10112 |
| Zhiqiang Liu | (212) 278-0421 |
| Patterson Belknap Webb & Tyler LLP | jwhite@cooperdunham.com |
| 1133 Avenue of the Americas | |
| New York, New York 10036 | |
| (212) 336-2000 | |
| sazalesin@pbwt.com | |
| emgelernter@pbwt.com | |
| cchoi@pbwt.com | |
| iroyzman@pbwt.com | |

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

61

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

May 27, 2016                                    /s/ Elissa Matias
                                               Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

  X   The brief contains <u>13,968</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

  X   The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2013</u> in a <u>14</u> point <u>Times New Roman</u> font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.


Dated: May 27, 2016                Respectfully submitted,

<u>Gerald M. Murphy, Jr.</u>
BIRCH STEWART KOLASCH
& BIRCH, LLP
8110 Gatehouse Road, Suite 100 East
Falls Church, VA 22040-0747
Telephone: (703) 205-8000

*Attorneys for BioMarin Pharmaceutical Inc.*